Angela Renee AKINS  *v.*  Michael James MOFIELD

03–233                                                    132 S.W.3d 760

Supreme Court of Arkansas
Opinion delivered December 4, 2003

*Reid, Burge, Prevallet & Coleman,* by: *Robert L. Coleman,* for appellant.

*Stephen M. Trail,* for appellee.

ANNABELLE CLINTON IMBER, Justice. This appeal arises out of a paternity and child support case in which the Mississippi County Circuit Court found Appellee Michael Mofield to be the father of Jeremy Slaughter and required Mr. Mofield to pay both retroactive and prospective child support to Appellant Angela Renee Akins. Ms. Akins appeals and argues that the trial court erred because it did not follow the child support guidelines in awarding retroactive child support, and it did not take into account Jeremy's best interests when it deviated from the chart amount in awarding prospective child support. We agree that the trial court abused its discretion in setting the amounts of both awards, and we reverse and remand.

On November 7, 1989, Jeremy Slaughter was born to Angela Renee Slaughter (now Akins). Ms. Akins was a high school junior and Mr. Mofield a sophomore at the same high school when they dated during the spring of 1989, during which time they were

sexually intimate. Mr. Mofield's testimony was that he had heard rumors of Ms. Akins' pregnancy and that he might be the father. Concerned about this possibility, he confronted her but she refused to name the father. He asked Ms. Akins to have blood tests performed on the baby once it was born if she thought he was the father, but she declined to put her baby through a blood test. After Ms. Akins left the state to have the baby, he never saw her again and knew nothing about the child until the paternity suit was filed in March of 2000.

Ms. Akins's testimony differed significantly. She testified that when she found out she was pregnant, she informed Mr. Mofield and told him he was the father. Ms. Sharon Smith corroborated Ms. Akins's account, testifying that she and Ms. Akins were friends in high school, and she had witnessed a confrontation in a school hallway where Ms. Akins told Mr. Mofield she was pregnant and he was the father of the baby. According to Ms. Smith, Mr. Mofield responded by saying nothing and walking away.

Ms. Akins also testified that, contrary to Mr. Mofield's claim that he had never seen her again when she left to have the baby, she actually returned and finished her high school education at the same school, where Mr. Mofield was still in attendance. During the school year following Jeremy's birth, she approached Mr. Mofield several times in an effort to convince him to claim the child, but he refused to do so. She detailed an incident in which she showed him a picture of Jeremy and he refused to acknowledge him or to really look at the photograph. She also testified about a conversation in which Mr. Mofield stated that Jeremy's birthdate did not "add up" and he could not possibly be the father because Jeremy would have been born in December, based on the time they had dated. According to Ms. Akins, Jeremy was born several weeks early. She also stated that Mr. Mofield had never asked for blood tests, though she had approached him several times during the school year before she graduated in 1990, in her attempts to ask him to be part of Jeremy's life.

At one point, Ms. Akins had started paperwork with the Child Support Enforcement Unit to force Mr. Mofield to pay child support, but the man to whom she was married at that time threatened divorce if she allowed Mr. Mofield to "interfere" in their family, so she dropped the issue. When her marriage failed, she and Jeremy moved back to her home town and, in 1996, she

ran into Mr. Mofield in a Wal-Mart parking lot, where she told him they needed to talk about Jeremy. Mr. Mofield said he knew they needed to talk, but he could not speak with her then because his wife was inside the store. Though he said he would contact her, he never did. Ms. Akins later remarried and she and her husband are raising a young son in addition to Jeremy. Though she was employed through January 2002, she had to leave her job because the shift interfered with her family life.

On March 27, 2000, Ms. Akins filed a paternity action, asking the trial court to award her retroactive child support from the date of Jeremy's birth, prospective child support from the date of the complaint forward, and health benefits for Jeremy. The trial court ordered DNA tests at the request of Ms. Akins, and the test results proved that Mr. Mofield was Jeremy's natural father.

After a hearing on all the issues, the trial court found that Mr. Mofield was Jeremy's father and awarded custody of Jeremy to Ms. Akins with visitation for Mr. Mofield. Retroactive child support was awarded in the amount of $10.00 per month from Jeremy's birthdate until the complaint was filed in March 2000, $35.00 per week from March 27, 2000, to March 27, 2002, and $30.00 per week from March 27, 2002, until the hearing date in August 2002.[1] Prospective child support was awarded in the amount of $30.00 per week, which was less than half the $79.00 per week award as set forth in the child-support guidelines. The trial court then abated this amount by $15.00 per week for each week beyond the second week of Jeremy's summer visitation with his father.

The court found Mr. Mofield and his wife were spending more on monthly expenses than their combined income. This deficit spending and the fact that the Mofields have two dependent children were the reasons the trial court gave as justification for deviating from the chart amount when awarding prospective child support for Jeremy. Additionally, Mr. Mofield was to continue to cover Jeremy on his wife's medical insurance as long as it was available.

---

[1] The trial court awarded five dollars more from March of 2000 to March of 2002 because Mr. Mofield and his wife had only one child at that time.

We review chancery cases *de novo*, but will only reverse if the trial court's findings are clearly erroneous or clearly against the preponderance of the evidence. *Ford v. Ford*, 347 Ark. 485, 65 S.W.3d 432 (2002). A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *Id.* We give due deference to the trial court's superior position to determine the credibility of the witnesses and the weight to be given their testimony. *Id.* In a child-support determination, the amount of child support lies within the sound discretion of the trial court. *Id.* As a rule, when the amount of child support is at issue, we will not reverse the trial court absent an abuse of discretion. *Id.*, *McWhorter v. McWhorter*, 346. Ark. 475, 58 S.W.3d 840 (2001). However, a trial court's conclusions of law are given no deference on appeal. *Ford v. Ford, supra*. The trial court is required to reference to the child-support chart, and the amount specified in the chart is presumed to be reasonable. *Ford v. Ford, supra; Smith v. Smith*, 337 Ark. 583, 990 S.W.2d 550 (1999). However, the presumption that the chart is correct may be overcome if the trial court provides specific written findings that the chart amount is unjust or inappropriate. *Ford v. Ford, supra; Smith v. Smith, supra*.

### Retroactive Child Support

The Arkansas Child Support Guidelines set child support at an amount determined by the weekly or monthly take-home pay of the noncustodial parent. *See In re: Administrative Order Number 10: Arkansas Child Support Guidelines*, 331 Ark. 581 (1998). Administrative Order Number 10 includes the following language in Section I:

> It is a rebuttable presumption that the amount of child support calculated pursuant to the most recent revision of the Family Support Chart is the amount of child support to be awarded in any judicial proceeding for divorce, separation, paternity, or child support. The court may grant less or more support if the evidence shows that the needs of the dependents require a different level of support.

> All orders granting or modifying child support (including agreed orders) shall contain the court's determination of the payor's income, recite the amount of support required under the guidelines, and recite whether the court deviated from the Family Support

Chart. If the order varies from the guidelines, it shall include a justification of why the order varies as may be permitted under Section V hereinafter. It shall be sufficient in a particular case to rebut the presumption that the amount of child support calculated pursuant to the Family Support chart is correct, if the court enters in the case a specific written finding within the Order that the amount so calculated, after consideration of all relevant factors, including the best interests of the child, is unjust or inappropriate.

*Administrative Order Number 10 — Child Support Guidelines* (2003).

In awarding retroactive child support for Jeremy, the trial court made no reference to the child-support guidelines in either its letter opinion of August 12, 2002, or its judgment filed on November 22, 2002. Instead, in making its retroactive child-support award, the trial court's letter opinion cited to Arkansas Code Annotated § 9-10-111(a) (Repl. 2002), which is part of the Paternity chapter, Chapter 10, of Title 9 of the Arkansas Code Annotated. The Paternity Chapter, § 9-10-101, *et seq.* provides in pertinent part:

9-10-109. Child support following finding of paternity.

(a)(1) Subsequent to the execution of an acknowledgment of paternity by the father and mother of a child pursuant to § 20-18-408 or § 20-18-409, or a similar acknowledgment executed during the child's minority, or subsequent to a finding by the court that the putative father in a paternity action is the father of the child, the court shall follow the same guidelines, procedures, and requirements as set forth in the laws of this state applicable to child support orders and judgments entered by the chancery court as if it were a case involving a child born of a marriage in awarding custody, visitation, setting amounts of support, costs, and attorney's fees, and directing payments through the clerk of the court. . . .

\* \* \* \*

9-10-111. Judgment for child support—Bond.

(a)  If it is found by the chancery court that the accused is the father of the child and, if claimed by the mother, the chancery court or chancellor shall give judgment for a monthly sum of not less than

ten dollars ($10.00) per month for every month from the birth of the child until the child attains the age of eighteen (18) years.

Ark. Code Ann. §§ 9-10-109(a) & 9-10-111(a) (Repl. 2002).

Section 9-10-111(a), on which the trial court based its retroactive award of $10.00 per month from the date of Jeremy's birth until the complaint was filed by Ms. Akins, was amended in 1927, when the monthly child-support sum was set at "not less than ten dollars." Ark. Acts 1927, No. 111, § 1. The last time this section was amended was 1983, several years before the ·child-support guidelines were implemented in Arkansas.

Ms. Akins argues the trial court erred in ignoring Administrative Order Number 10 when it set the retroactive child-support amount. She contends Administrative Order Number 10 is, on its face, applicable to any case involving paternity or child support, and retroactive child support should be treated no differently than prospective child-support awards. She further states that there is no authority, statutory or otherwise, that allows retroactive child support to be treated differently than prospective child support.

Mr. Mofield asserts that this court has consistently treated awards for retroactive support differently than other child-support awards and claims this is sound public policy. The trial court, Mr. Mofield argues, was free to disregard Administrative Order No. 10 and set retroactive support at any amount it deemed fair. In support of his argument, Mr. Mofield cites several cases in which retroactive child support was deemed discretiónary: *Ryan v. Baxter*, 253 Ark. 821, 489 S.W.2d 214 (1973); *Green v. Bell*, 308 Ark. 473, 826 S.W.2d 226 (1992); *Arkansas Dept. of Human Services v. Hardy*, 316 Ark. 119, 871 S.W.2d 353 (1994), and *Arkansas Dept. of Human Services v. Forte*, 46 Ark. App. 115, 877 S.W.2d 949 (1994). None of these cases, however, is controlling on this issue.

*Ryan v. Baxter, supra,* is inapposite because it was decided in 1973, before the implementation of the child-support guidelines. *Green v. Bell, supra,* is also no help to Mr. Mofield because, while decided in 1992, it concerned a plaintiff who filed suit on February 2, 1990, requesting retroactive child support for years prior to 1990. However, it was not until February 5, 1990, that this court adopted the first presumptively correct child-support guidelines, *after* the time period for which the *Green v. Bell*

plaintiff was requesting retroactive child support. *See In re: Guidelines for Child Support Enforcement*, 301 Ark. 627, 784 S.W.2d 589 (1990).

Both *Arkansas Dept. of Human Services v. Forte, supra*, and *Arkansas Dept. of Human Services v. Hardy, supra*, were decided after the guidelines were first implemented. However, in neither *Forte* nor *Hardy* did the plaintiff argue that the child-support guidelines should be followed in determining retroactive child support. Further, in *Forte, supra*, the father had been providing support since the birth of the child, albeit without a court order to do so; and in *Hardy, supra*, the child had been born to a married woman who had contended her husband had fathered the child. In the instant case, Mr. Mofield admitted that he knew of Ms. Akins's pregnancy and that he knew he was rumored to be the father, yet he chose not to request a court order for blood tests to determine whether Jeremy was his son.

Mr. Mofield lastly argues that this court had an opportunity in *Bean v. Office of Child Support Enforcement*, 340 Ark. 286, 9 S.W.3d 520 (2000), to state that Administrative Order Number 10 applies to retroactive child support, yet we refused to do so. We disagree. In *Bean v. Office of Child Support Enforcement, supra*, neither party referenced the child-support guidelines in arguing for or against retroactive child support, so that issue was not before us.

The issue is now squarely before us in the instant case. Ms. Akins provided the trial court with evidence of Mr. Mofield's income for each year since Jeremy's birth, along with the relevant weekly and monthly child-support amounts pursuant to the version of the child-support guidelines that was in effect for each year. This evidence was introduced without objection and was not disputed by Mr. Mofield. As we held in *Fonken v. Fonken*, 334 Ark. 637, 976 S.W.2d 952 (1998), a parent has a legal duty to support his minor children, regardless of the existence of a support order. *Fonken* was a case in which we affirmed a retroactive child-support award in excess of $19,000 to a young man who had reached majority and sued his father for child support. In *Fonken*, the mother of the boy had told the father he could cease paying his voluntary child-support payments. We held that the obligation of a parent to support a child financially did not depend upon a court order, nor did it depend upon the mother requesting the support:

There was no valid order of any court requiring the father to support his minor child during this period of time, but he continued to have both a legal and moral duty to do so. *McCall v. McCall*, 205 Ark. 1123, 1126, 172 S.W.2d 677, 678 (1943). Mrs. Fonken's actions in telling Mr. Fonken to stop paying child support, and his reliance thereupon, are insufficient to relieve him of his legal obligation to his minor child. Even when the support obligation may be affected by contract, the duty cannot be bartered away permanently to the detriment of the child. *Storey [v. Ward]*, 258 Ark. 24 at 26, 523 S.W.2d at 389; *Robbins v. Robbins*, 231 Ark. 184, 187, 328 S.W.2d 498, 500 (1959).

*Fonken v. Fonken*, 334 Ark. at 642, 976 S.W.2d at 955.

*Fonken v. Fonken, supra*, clearly shows that child support is an obligation owed to the child; and, in this case, it is an obligation owed to Jeremy by Mr. Mofield. We agree with Ms. Akins that, since the implementation of the child support guidelines, there is no authority, statutory or otherwise, for treating retroactive child support differently than prospective child support under those guidelines. Therefore, we hold that Administrative Order Number 10 and its predecessor child support guidelines set out the presumptively correct amount of child support for retroactive child support for those years in which the guidelines were in place, beginning on February 5, 1990.

Accordingly, we reverse and remand for the trial court to award retroactive child support pursuant to the guidelines in Administrative Order No. 10 that were in place since Jeremy's birth.

### Prospective Child Support

Ms. Akins also argues that the trial court erred when it set prospective child support in the amount of $30.00 per week, rather than the presumptive $79.00 per week that was calculated pursuant to the Family Support Chart. The child support guidelines do allow for deviations from the presumptive amount as follows:

All orders granting or modifying child support (including agreed orders) shall contain the court's determination of the payor's income, recite the amount of support required under the guidelines, and recite whether the court deviated from the Family Support

Chart. If the order varies from the guidelines, it shall include a justification of why the order varies as may be permitted under SectionV hereinafter. It shall be sufficient in a particular case to rebut the presumption that the amount of child support calculated pursuant to the Family Support chart is correct, if the court enters in the case a specific written finding within the Order that the amount so calculated, after consideration of all relevant factors, including the best interests of the child, is unjust or inappropriate.

*Administrative Order Number 10: Child Support Guidelines*, § I, ¶ 3 (2003). Section V of the guidelines sets out deviation considerations, which include twelve relevant factors, such as food, shelter, child care, etc., to be applied to the child or children in question, as well as eight additional factors that may warrant an adjustment to the child support obligation. Included in those eight additional factors is factor number 7, which is the support, whether voluntary or by court order, the payor provides for other dependent children.

In the instant case, the trial court found that the chart amount of child support for Jeremy was $79 per week based on Mr. Mofield's take-home pay. The trial court's letter opinion and judgment make no mention of any of the Section V factors as applied to Jeremy. Instead, the trial court deviated from the chart amount for the reasons stated in findings number 6 and 7 of its November 22, 2002 judgment:

> 6. With regard to child support, the court finds that the Defendant owes a continuing duty of support to his son. The Defendant's Affidavit of Financial Means which was admitted in evidence at trial as Defendant's Exhibit 4 shows that he has weekly net take home pay of $378.64 per week. In accordance with the Family Support Chart incorporated in Administrative Order No. 10, the Defendant would be obligated to pay $79.00 per week for the support of Jeremy Paul Slaughter. *However, the Defendant has married and has two children who are five months of age and four years of age and who are dependent upon him for support.* Further the Affidavit of Financial Means (Defendant's Exhibit 4) shows that Defendant's spouse also works at Viskase and her weekly net pay is $301.75. Their combined net weekly pay is $680.39 or their monthly net pay is $2,948.35. The expenses he lists on his Affidavit of Financial Means total $2,502.10. The Defendant and his wife have debts which total

$59,636.90 and the monthly payments are $890.78. *Their monthly obligations are $3,392.88; in other words, they are paying out more than they are taking in.*

7. That the court feels justified in deviating from the Family Support Chart *for the primary reason that the Defendant has married and has two dependent children* and it has considered those factors *as set forth in Section V* of the Administrative Order No. 10. The Defendant is, therefore, hereby directed to pay child support to the Plaintiff for the support of Jeremy Paul Slaughter in the amount of $30.00 per week commencing August 7, 2002. That amount should be paid to the Clerk of the Court together with the appropriate administrative fee until such time as income withholding is implemented.

(Emphasis added.)

■ The trial court's judgment does not set out specific written findings as to how the Section V factors apply to Jeremy himself. The only specific written findings the trial court made for its justification for the deviation were that the monthly obligations of Mr. Mofield and his wife are $3,392.88, which is more than they take in, and the fact that Mr. Mofield and his wife have two dependent children. In fact, the trial court miscalculated, and the record shows that the actual monthly obligations of the Mofields are $2,637.10, which is $311.25 *less* per month than the Mofields's combined salaries, which total $2,948.35 per month. Mr. Mofield is actually paying out less than he is taking in, and the trial court's finding to the contrary was clearly erroneous.[2]

■ Mr. Mofield admits that a mistake was made, but argues that the miscalculation was "harmless error." Yet, the miscalculation and the finding by the trial court that Mr. Mofield

---

[2] Mr. Mofield listed his mortgage payment of $445.48 and one car payment of $310.30 as monthly debt payments on his Affidavit of Financial Means. He listed another car payment of $400.00 as a joint debt held by him and his wife. All three of these payments were also listed on Mr. Mofield's calculation of his monthly expenses. Ms. Akins asserts that the trial court counted Mr. Mofield's mortgage and two car payments twice, both as expenses and as debts. An examination of the record, however, shows that the trial court double-counted the mortgage and the car payment of $310.30 as both expenses and debts, but the other car payment for $400 was not added twice by the trial court into the debt calculation. Therefore, the trial court's figure of $3392.88 should be reduced by $755.78, to arrive at Mr. Mofield's total monthly expenses of $2637.10.

supports two dependent children are the only reasons given by the trial court for deviating from the chart amount. As stated *supra*, the chart amount is presumptively correct and shows that Jeremy's child support should be set at $79 per week. Certainly, according to his own figures, Mr. Mofield has $311.25 in disposable income each month. The trial court found that Mr. Mofield could pay $30.00 per week when he was supposedly "paying out more than he was taking in." We cannot agree with Mr. Mofield's assertion that it is harmless error to deny Jeremy the additional $49.00 per week, when Mr. Mofield actually has more than $300 extra each month.

■ Another reason the miscalculation is not harmless error is that the trial court's two reasons for deviating from the chart amount, the deficit spending and Mr. Mofield's support of his two dependent children, are interdependent. The support of Mr. Mofield's two dependent marital children is *included* in the calculation of Mr. Mofield's monthly expenses. Therefore, it would be reasonable for the trial court to assume that, if Mr. Mofield and his wife are deficit spending, their children will suffer from further deficit spending. Once the miscalculation is corrected, however, the deficit spending is no longer a justification for the deviation; and, since the Mofield children's support is already included in Mr. Mofield's monthly expenses, their support is also no longer a separate justification for the deviation. Because of their interdependence, when the first justification fails the other does also. Thus, the miscalculation cannot be harmless error.

■ The miscalculation alone would be enough to reverse and remand the prospective child support award, but the trial court's findings were clearly erroneous for another reason. The child support guidelines are clear that a deviation from the chart amount is justified only if the court concludes that amount is unjust or inappropriate "after consideration of all relevant factors, *including the best interests of the child." Administrative Order Number 10: Child Support Guidelines*, § I, ¶ 3 (2003). Nowhere in the letter opinion or the judgment does the trial court consider Jeremy's best interests.

■ Because the trial court's findings as to Mr. Mofield's income and expenses are clearly erroneous, and there is no indication the trial court considered the best interests of Jeremy as

required by the child-support guidelines, in addition to reversing and remanding on the issue of retroactive child support, we must also reverse the prospective child-support award and remand for the trial court to make correct findings.

Reversed and remanded.

HANNAH, J., dissents.

CORBIN, J., not participating.